# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NICKY POPE,                            )

                                )

             Plaintiff,                )

                                )

             v.                        )        Civil Action No. 06-01009

                                )        Judge Nora Barry Fischer

ROSTRAVER SHOP AND SAVE, ET AL.,    )

                                )

             Defendants.           )

## OPINION

This case centers on an accusation of shoplifting against Plaintiff Nicky Pope ("Pope"), occurring on June 5, 2004 at the Rostraver Shop'n Save. As a result of that incident, Pope filed state and federal claims against Rostraver Shop'n Save ("Shop'n Save") and Howard Russell ("Russell") (collectively, "Shop'n Save Defendants") as well as Rostraver Township, Rostraver Township Police Department, and Officer George Milkent,[1] ("Milkent") (collectively, "Rostraver Defendants"). Pending before this Court is Shop'n Save Defendants' Motion for Summary Judgment [30], Rostraver Defendants' Motion for Summary Judgment [34] and Pope's Cross-Motion for Summary Judgment [41], all of which are now ripe for disposition.

## BACKGROUND

On June 5, 2004, Pope went to the Rostraver Shop'n Save to purchase some items. Upon entering the store, Pope stopped at the bakery counter and purchased a cup of coffee and a slice of cake to eat while in the store. (Docket No. 30-6 at 11:2-14) (hereinafter, "Pope Dep."). She placed the cake in a Shop'n Save bag in her cart. (Pope Dep. at 11:18-12:2). Pope proceeded to browse through the store, walking through every aisle in order to pick "[j]ust a couple of items."

---

[1]

The caption in this matter incorrectly spells Officer Milkent's name as "Milket."

(Pope Dep. at 13:2-18).  While Pope was browsing the store, she drew the attention of the store employees, mainly due to the amount of time she was spending in the store, the few number of items she had purchased, and the open Shop'n Save bag in her cart. (Docket No. 30-7 at 27:5-20) (hereinafter "Russell Dep").  Upon notification by another employee of a "person walking back and forth throughout the store without much in her cart," Howard Russell, the store manager, proceeded to watch Pope as she shopped. (Russell Dep. at 27:5-20).  Russell observed that Pope was wearing a long sleeve, unbuttoned flannel shirt over a t-shirt.  (Russell Dep. at 33:9-14).  While Pope was walking down one aisle, Russell observed "a motion" from Pope, describing her hand going "underneath and back into the long-sleeve flannel shirt" followed by a "movement made down, possibly into the pants" and thereafter her "arm came back out."  (Russell Dep. at 33:15-20).  Russell further observed a "protrusion ... from the left area of [Pope's] back, at about the belt area."  (Russell Dep. at 33:23-25).  Finally, Russell testified that, because of her shirt as well as her movement and "the way she was positioned at the cart," he could not see whether Pope had actually concealed any item.  (Russell Dep. at 34:19-21).

Sometime thereafter, Pope proceeded to check out while Russell continued to watch her. (Russell Dep. at 37:19-24).  Once Pope finished paying for her items, she began to exit the store and Russell stopped Pope in the vestibule area of the store and asked to see her receipt. (Pope Dep. at 15:18-16:9).  Russell verified that her bakery receipt and store receipt matched her goods, including the cake and coffee that Pope bought from the bakery.  (Pope Dep. at 15:18-16:9).  Russell then asked Pope to lift her outer shirt up to see if she had concealed any items behind her shirt or in her pants, to which Pope refused.  (Pope Dep. at 15:18-16:9).  The parties do not dispute that Russell never touched Pope, nor did he create any physical barrier to prevent her from exiting the store. (Docket No. 39 at ¶4).  During this exchange, Pope became very upset

at being accused of shoplifting. Pope told Russell that she was only being stopped because she was black and was going to sue and Russell informed Pope that he was calling the police and for her not to leave. (Pope Dep. at 18:12-21). Pope believed that because the police were called by Russell, she was not free to leave. (Pope Dep. at 80:4-17). Pope and Russell waited approximately five to ten minutes for the police to arrive and during that time Pope made a phone call to her grandmother. (Pope Dep. at 19:18-20:6). During the wait, Pope neither asked to leave nor made any attempt to leave. Pope testified at her deposition that it was her choice to wait and talk to the police. (Pope Dep. at 73:3-18).

Officer Milkent was dispatched to Shop'n Save on the report of a possible shoplifting. (Docket No. 36 at ¶1). Milkent was on regular duty and in full uniform. (Docket No. 36 at ¶2). Upon his arrival at the Shop'n Save, Milkent observed Russell waiting for him outside the store while Pope was waiting alone in the vestibule area inside the store. (Docket No. 30-8 at 17:24-18:2) (hereinafter "Milkent Dep."). Russell informed Milkent what he had observed and thereafter Pope exited the store and approached Milkent. Milkent stated in his deposition that he told Pope that she could leave anytime she wished and that she was not under arrest. (Milkent Dep. at 27:24-25). Milkent asked Pope if she had anything under her shirt, to which she responded "no." (Docket No. 36 at ¶13). Milkent then asked Pope to lift up her outer shirt and then she could leave, to which she complied. (Milkent Dep. at 27:15-22). Milkent testified that, based upon his observations, he was not able to be sure as to whether or not Pope had a concealed item. (Milkent Dep. at 37:16-24.) When asked why he did not arrest her, Milkent responded that he did not feel comfortable escalating the situation, in particular because of Pope's lack of cooperation. (Milkent Dep. at 39:16-40:2). Pope claims that after she lifted her shirt, Milkent proceeded to poke her two or three times in her pants, which Milkent denies.

(Pope Dep. at 22:18-23:15; Milkent Dep. at 40:3-11). After Pope claims to have been poked, she then was told she could leave. The exchange with Milkent took approximately ten minutes. (Pope Dep. at 25:24-26:11). Pope was never charged with shoplifting or any other criminal charges. In the time since the incident, Pope claims to have suffered from panic attacks and lack of sleep. (Pope Dep. at 33:8-20).

## PROCEDURAL BACKGROUND

On April 30, 2006, Pope filed a Praecipe for Writ of Summons in the Court of Common Pleas of Westmoreland County, Pennsylvania. Subsequently, Pope filed her Complaint on July 7, 2006, in which she alleged the following: (1) "civil rights violation[s]" pursuant to 42 U.S.C. §1983 against all Defendants; (2) assault and battery against Officer Milkent and the Rostraver Defendants; (3) false imprisonment against all Defendants; (4) and intentional infliction of emotional distress against all Defendants. On July 27, 2006, Defendants removed Pope's Complaint to this Court alleging jurisdiction under 28 U.S.C. §§ 1331 and 1343.

On October 13, 2006, the Shop'n Save Defendants filed a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6), which the Court granted on March 9, 2007, dismissing with prejudice all claims against the Shop'n Save Defendants except for false imprisonment.[2] *See Pope v. Rostraver Shop'n Save, et al.*, No. 2:06-CV-1009, 2007 WL 776115, at *1 (W.D. Pa. March 9, 2007). Thereafter, the Rostraver Defendants filed their Answer and Affirmative Defenses on January 16, 2007. On July 23, 2007, the Shop'n Save Defendants filed their

---

[2]

Judge Thomas M. Hardiman presided over this matter until his elevation to the U.S. Court of Appeals for the Third Circuit on or about April 5, 2007, at which time the instant matter was transferred to the undersigned Judge.

Answer and Affirmative Defenses.  Since that time, the case has proceeded through discovery and the instant summary judgment motions were filed.

## SUMMARY JUDGMENT STANDARD

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c) (2007).[3]  In deciding a summary judgment motion, the court must "view the evidence . . . through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not."  *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242,247 (3d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the movant has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling-*

---

[3]

On December 1, 2007, Amendments to the Federal Rules of Civil Procedure went into effect. At the time of the filing of the briefs, the 1987 version of Rule 56 was in effect.  The changes to Rule 56 are stylistic only and do not effect the disposition of the motions before this Court.  *See* Fed.R.Civ.P. 56 advisory comm. nn. 2007 amend. (West 2007).

*Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). Thus, the non-moving party cannot rest on the pleadings, but instead must go beyond the pleadings and present "specific facts showing a genuine issue for trial," Fed.R.Civ.P. 56(e)(2) (2007), and cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a motion for summary judgment. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Celotex*, 477 U.S. at 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994)).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255 (1986)); s*ee also Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir. 2001) (providing that "a court must take the facts in the light most favorable to the nonmoving party, the [plaintiffs], and draw all reasonable inferences in their favor") (citation omitted)).

## ANALYSIS

The Court will first address the sole remaining claim of false imprisonment against the Shop'n Save Defendants and then address the claims against the Rostraver Defendants.

## I. CLAIMS AGAINST SHOP'N SAVE DEFENDANTS

As an initial matter, the Court has jurisdiction over the false imprisonment claim against the Shop'n Save Defendants by way of 28 U.S.C. §1367 (1988). Section 1367 provides that

federal district courts "shall have supplemental jurisdiction over all of the claims that are so related to [federal] claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. §1367(a). Here, the Court finds that the claim of false imprisonment is "so related" to the federal claims against the Rostraver Defendants that they "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 717, 725 (1966). As stated above, the claims against Shop'n Save Defendants and Rostraver Defendants arise out of one singular incident, the accusation of shoplifting against Pope at the Rostraver Shop'n Save on June 5, 2004. In the interests of judicial economy and efficiency, the Court exercises supplemental jurisdiction over the state law claim of false imprisonment against the Shop'n Save Defendants.

In a claim for false imprisonment, the plaintiff seeks to protect his or her interest in the freedom from restraint of movement. Under the law of Pennsylvania, a plaintiff bears the burden of proving that the defendant (1) acted intentionally to confine the plaintiff within boundaries fixed by the defendant; (2) that the act of the defendant either directly or indirectly resulted in said confinement of the plaintiff; and (3) the plaintiff is either conscious of said confinement or is harmed by it. *Caswell v. BJ's Wholesale Co.*, 5 F.Supp.2d 312, 319 (E.D. Pa. 1998); *Gagliardi v. Lynn,* 285 A.2d 109, 111 (Pa. 1971); *see* Restatement (Second) of Torts §35 (1965). The Shop'n Save Defendants argue that they are entitled to summary judgment because Pope cannot prove facts sufficient to establish that she was confined by the Shop'n Save Defendants.

In order for there to be a false imprisonment, the confinement must be complete. *Caswell*, 5 F.Supp.2d at 319. "If a known, safe means of escape, involving only a slight inconvenience exists there is no false imprisonment." *Id.* (citing *Chicarelli v. Plymouth Garden*

7

*Apartments*, 551 F.Supp. 532, 541 (E.D.Pa. 1982)).  The confinement can be effectuated either through physical means and barriers or through threats or coercion.  *Chicarelli*, 551 F.Supp. at 541.  "The fact that a plaintiff merely believes she is not free to leave is not enough to support a claim of false imprisonment.  A plaintiff must make some attempt to determine whether her belief that her freedom of movement has been curtailed has basis."  *Caswell*, 5 F.Supp.2d at 319.  Said attempt could be made if the plaintiff makes a failed request to leave.  *Id.*

The Shop'n Save Defendants cite *Caswell* as a example of an unreasonable belief of confinement, arguing that Pope's belief of confinement is equally unreasonable.  *Caswell* involved a plaintiff claiming to have been confined in a back room of the store when the store managers sought to question the plaintiff about incriminating photographs that the plaintiff had developed at the store, evidencing possible child abuse.  The managers informed the plaintiff that they were calling the police.  The plaintiff spoke to the managers for approximately ten minutes then she left the room to move her car from a no parking zone.  At no time during this incident did the managers touch the plaintiff or make any threats towards her.  Based upon these facts, the Court held that no reasonable jury could find that the managers falsely imprisoned the plaintiff in that the calling of the police and the standing in the doorway was not enough to create an issue of confinement for the jury.  *Caswell*, 5 F.Supp.2d at 319.  Accordingly, the Court held, there could not be any confinement when the plaintiff was able to and did walk out of the room to her car unimpeded by the managers.  *Id.*

In contrast, Pope cites *Pinkett v. Super Fresh Food Markets, Inc.*, Civ. A. No. 87-4573, 1988 WL 30952, at *1 (E.D. Pa. March 28, 1988), in which the plaintiff was in line at a grocery store when an employee came up from behind her, grabbed the plaintiff's arm, demanded that he look in her purse, and accused her of shoplifting.  The plaintiff told the employee that she was

not going to let him search her purse. The employee responded to the plaintiff that she was not going to leave the store unless he was able to check her bag. Upon the employee's repeated insistence that "you are not going to leave the store until I search your bag," the plaintiff summoned a store security guard and opened her purse for him. The security guard indicated that there were no stolen goods in her purse and the employee relented on searching her purse. The plaintiff was then able to finish checking out and left the store unimpeded. The whole incident took approximately ten minutes. The Court held that the jury's verdict in favor of the plaintiff that there was a false imprisonment was not unreasonable given the repeated threats of the store employee. *Id.* at *5. "While there was no confinement in the literal sense of physical barriers, the repeated threats of the store employee that 'you are not going to leave the store until I search your bag' could reasonably be construed as constituting confinement by submission to duress or coercion." *Id.* Further, when combined with the store employee grabbing the plaintiff's arm, the Court concluded that sufficient evidence existed to support the jury's verdict that said threats and touching coerced the plaintiff to give up her freedom of movement--"she must have felt that she could not leave the store until she proved her innocence." *Id.*

Using *Caswell* and *Pinkett* as guideposts for what is a reasonable or unreasonable belief of confinement, respectively, the Court finds that the facts of this case more closely aline with *Caswell* and that Pope's belief that she was imprisoned is not founded. It is undisputed by the parties that at no time did Russell touch Pope or any of her property. (Pope Dep. at 58:21-24). Hence, it is only what Russell allegedly said to Pope that could possibly constitute a threat to coerce her into being confined within the Shop'n Save:

> Q.    And describe for me what happened once you left the
>       checkout aisle.

A.   As soon as I left the aisle, Howard Russell approached me. He wanted to know what was in the little bag. And I opened the bag up for him. And he asked me if I had a receipt, and I gave him the receipt. So, after that, he looked through the other bags that was paid for, and he looked at the receipt and he matched them.

Then after he seen everything was matched, he wanted to know what I had in my pants, and I told him nothing. So he asked me to lift my shirt up, and I said no. So [Russell] told me if I didn't lift my shirt up, he was going to call the police. So, it took a little while for the police to arrive.

. . .

Q.   And what was your response [to where he had asked you to lift up your shirt]?
A.   I told him no.
Q.   And what happened then?
A.   He told me he was going to call the police.
Q.   And what was your response to that?
A.   I said, go ahead.

. . .

Q.   Did [Russell] say specifically, you cannot leave?
A.   Yes, he's going to call the police, he said you cannot leave.
Q.   There's a difference there. I know you testified earlier he said he was calling the police?
A.   Yes.
Q.   And by that you understood you could not leave?
A.   Yes.
Q.   Did he specifically say, you cannot leave?
A.   Yes.

(Pope Dep. at 15:18-16:9, 18:16-21, 60:13-23). A plain reading of Pope's deposition indicates that Russell informed her that he was going to call the police and that she cannot leave. However, her deposition further indicates that she never tested whether she could leave or make a request to leave:

Q.   ... How was [Russell] refusing to release you?
A.   Because he told me he was calling the police, not to leave.
Q.   And again, that's your testimony that it was your belief that you could not leave because he was calling the police?

10

A.    Yes.

. . .

Q.    . . . Did you ask [Russell] why you cannot leave?
A.    No.
Q.    Did you ever ask him to let you go?
A.    No.
Q.    Did you ever try to go?
A.    No.
Q.    What was your understanding about why you could not leave?
A.    He told me he he was calling the police.
Q.    And that meant that you had to stay there?
A.    Yes.
Q.    You never asked him whether or not you could walk out the door?
A.    No.
Q.    Did he ever physically stop you from walking out the door?
A.    No.
Q.    Did he ever put any barricades or buggies or anything to stop you from walking out the door?
A.    No.
Q.    So, it was your belief that you couldn't leave; is that correct?
A.    Yes.

. . .

Q.    The other two employees that were there, did they attempt to stop you at all from leaving the store?
A.    No.
Q.    And again, you never asked to leave the store while you were in the vestibule?
A.    No.
Q.    Did you ever attempt to leave the store while you were in the vestibule?
A.    No.

. . .

Q.    While they were out there talking, did you go out of the doors to talk to Mr. Russell and to the police officer?
A.    Yes.
Q.    You did?
A.    Yes.

> Q. So, whenever you talked to the police officer, it was actually outside of the store?
> A. Yes.
> Q. Did the police officer then make you come back inside of the store?
> A. No.
>
> . . .
>
> Q. So, it was your choice to stop and talk to the police officer?
> A. Well, he was called there for me, so I knew I couldn't leave.
> Q. Did you ask if you could leave?
> A. No.
> Q. So, you stopped there and it was, again, your choice to wait there and talk to the police officer?
> A. Well, I - - yes.

(Pope Dep. at 80:6-13, 60:24-61:21,68:21-69:7, 68:20-69:6, 73:9-18). In addition Milkent stated at his deposition that Pope wasn't being detained when he arrived at the scene.

> Q. Okay. And was [Pope] being detained by the store when you arrived?
> A. No.
>
> . . .
>
> Q. Let me ask you, was she in custody?
>
> . . .
>
> A. No, Because she was in the store and Howard was outside when I got there.

(Milkent Depo. at 19:15-16, 20:1-9).

Drawing all reasonable inferences in Pope's favor, the facts reveal the following: Russell asked Pope for her receipt and checked it against her purchases; Russell asked Pope to lift up her outer shirt, which she refused to do; Russell told Pope that she could not leave and that he was

calling the police; and Pope decided to wait to talk to the police. Indeed, Milkent found Pope was "not in custody" upon his arrival. (Milkent Depo. at 23:14-18).

The Court recognizes that while the facts of this case have some similarity to *Pinkett*, the differences are material and determine a different outcome. The store employee in *Pinkett* grabbed the plaintiff's arm and repeatedly demanded that the plaintiff show the employee what was inside her purse. *Pinkett*, 1988 WL 30951 at *1. Here, Pope does not claim that Russell asked to search her repeatedly. In *Pinkett*, the store employee informed the plaintiff that she was not going to leave the store until he searched her purse. *Id*. Such a statement made in conjunction with the grabbing of the plaintiff's arm allowed for a reasonable inference that the store employee was making a threat of physical force. Here, Pope was never touched by Russell and she stated it was her choice to wait and to talk to the police. As a result, Russell's actions never resulted in Pope being confined.

Pope argues that Russell's words and acts should be analyzed under sections 40A and 41 of the Restatement (Second) of Torts. The Court takes note that sections 40A (confinement by other duress) and 41 (confinement by asserted legal authority) of the Restatement (Second) of Torts have not been specifically adopted by the Supreme Court of Pennsylvania.[4] Nevertheless,

---

[4] Courts have specifically declined to apply section 40A. *See Crivellaro v. Pa. Power and Light Co.*, 24 Pa. D. & C.3d 590, 596, 1982 WL 761 (Pa.Com.Pl. 1982). However, the *Chicarelli* Court cited sections 38-41 of the Restatement (Second) of Torts as a means to effectuate a confinement, *see Chicarelli*, 551 F.Supp. at 541, and the *Pinkett* Court noted that a confinement may be accomplished by submission to other forms of duress or coercion (however without citing section 40A specifically), *see Pinkett*, 1988 WL 30952, at *5. *See also Thorsen v. Kaufmann's Department Stores*, 55 Pa. D. &. C.4th 565, 2000 WL 33909344 (Pa.Com.Pl. 2000)(denying demurrer where plaintiff alleged confinement to a fitting room when the employee took plaintiff's pants and refused to give them back). In the same way, without specifically citing section 41, in *Pennoyer v. Marriott Hotel Services, Inc.,* 324 F.Supp.2d 614 (E.D. Pa. 2004), the Court denied defendants' motion for summary judgment "because the plaintiff could have reasonably believed that the hotel was claiming lawful authority to confine him until the Philadelphia police arrived." *Id.* at 620.

because Pope's claim fails under both sections, this Court need not (and does not) determine whether sections 40A and 41 would be adopted by the Supreme Court of Pennsylvania.

First, as to section 40A, Pope cites *Pinkett* as an example where the plaintiff could be reasonably understood to be detained due to confinement by other duress. The Court disagrees with Plaintiff's characterization of *Pinkett*. The threat in *Pinkett* was one of force in that, if the plaintiff did not submit, she would have been apprehended by the employee and her purse searched, which falls under section 40.[5] Because neither *Pinkett* nor the instant case involves any allegations of threats being made towards Plaintiff's family nor a threat to take or harm Plaintiff's property or any other threats of like kind, there is no other form of duress present that could have confined Pope.

Second, as to section 41, Pope argues that Russell confined her by asserting legal authority when he stated that he intended to call the police.[6] In this Court's estimation, Russell's

---

[5]

The comment to section 40A further demonstrates that section 40A did not apply to *Pinkett* and likewise is not applicable to the facts here. The Comment provides:

> Under the rule stated in § 40, the confinement may be by submission to duress in the form of threats of physical force. Under this Section it may be submission to other forms of duress, whenever the duress is sufficient to make ineffective the consent which would otherwise be involved in the submission. Thus there may be confinement by submission to a threat to inflict harm upon a member of the other's immediate family, or his property . . . .

Restatement (Second) of Torts § 40A, comment a. (1965).

[6]

Section 41 of the Restatement (Second) of Torts provides:

> (1) The confinement may be by taking a person into custody under an asserted legal authority.
>
> (2) The custody is complete if the person against whom and in whose presence the authority is asserted believes it to be valid, or is in doubt

14

statement does not constitute an assertion of legal authority merely because he told her that he intended to call the police. In *Caswell*, the plaintiff was not confined when the store managers told her that the police were being called and that the store managers had seen what they thought was evidence of a crime. *Caswell*, 5 F.Supp.2d at 315, 319. Although the context of *Caswell* is different, the result is the same.

The Shop'n Save Defendants argue that even if there was a confinement of Pope, it was not a complete confinement because there was a means of escape that Pope did not use. "The fact that a plaintiff merely believes she is not free to leave is not enough to support a claim of false imprisonment." *Caswell*, 5 F.Supp.2d at 319. Pope admitted that she never asked if she could leave, nor did she make any attempts to leave. (Pope Dep. at 60:24-61:4). When Russell told Pope that he was calling the police and not to leave, she was in the front vestibule area and had an open means of escape, i.e., the doors to exit the store. (Pope Dep. at 60:24-61:4). Because Pope never tested whether her confinement was complete, Pope is only left with her belief that her confinement was complete and, as previously stated, a belief of confinement is not sufficient to prove a claim of false imprisonment. Moreover, Pope chose to wait, thus making her belief that she was confined all the more unreasonable.

---

as to its validity, and submits to it.

Restatement (Second) of Torts § 41 (1965). The comment to section 41 explains what is meant by asserting legal authority.

> The person asserting the authority may do so under some process which he represents as valid and sufficient to authorize him to take the other into custody or under an asserted privilege to do so without process. The taking of another into custody under such an authority is an arrest whether the authority be valid or invalid.

Restatement (Second) of Torts § 41, comment a. (1965).

In addition, while not raised in the Shop'n Save Defendants' motion for summary judgment, this Court finds that the Pennsylvania Retail Theft Immunity Act, 18 Pa. C.S.A. §3929(d) (2005), would apply to actions of the Shop'n Save Defendant employee, Russell. As discussed in greater detail *infra*, Russell's observations of Pope provided him with probable cause to reasonably detain Pope for a reasonable time. Hence, Russell is entitled to immunity from liability from Plaintiff's false imprisonment claim.

As a result, because Russell's conduct did not constitute a confinement and Pope never tested the reasonableness of her belief of confinement, Pope's claim for false imprisonment fails. Moreover, based on Russell's observations of Pope in the store amounting to probable cause, *see infra*, Russell is entitled to immunity under the Pennsylvania Retail Theft Immunity Act. Accordingly, the Shop'n Save Defendants' motion for summary judgment will be granted and Pope's cross-motion for summary judgment against the Shop'n Save Defendants as to false imprisonment will be denied.

## II.  CLAIMS AGAINST ROSTRAVER DEFENDANTS

This Court has jurisdiction over the claims against the Rostraver Defendants pursuant to 28 U.S.C. §1331, §1343 and §1367. Pope has alleged civil rights violations under § 1983 as well as state law torts of assault, battery, false imprisonment, and intentional infliction of emotional distress. Each set of claims against the Rostraver Defendants shall be treated separately.

### A.    PENNSYLVANIA RETAIL THEFT ACT IMMUNITY

The Rostraver Defendants raise the Pennsylvania Retail Theft Act, 18 Pa. C.S.A. §3929(d) (2005), as a complete defense to false imprisonment claim as well as the assault and battery claims. The Court agrees.

The Act provides in relevant part:

> **(d) Detention.**--A peace officer, merchant or merchant's employee or an agent under contract with a merchant, who has probable cause to believe that retail theft has occurred or is occurring on or about a store or other retail mercantile establishment and who has probable cause to believe that a specific person has committed or is committing the retail theft may detain the suspect in a reasonable manner for a reasonable time on or off the premises for all or any of the following purposes: to require the suspect to identify himself, to verify such identification, to determine whether such suspect has in his possession unpurchased merchandise taken from the mercantile establishment and, if so, to recover such merchandise, to inform a peace officer, or to institute criminal proceedings against the suspect. Such detention shall not impose civil or criminal liability upon the peace officer, merchant, employee, or agent so detaining.

18 Pa. C.S.A. §3929(d) (2005).[7]   On its face, the defense is predicated on the fact that the officers acted with probable cause in detaining the suspect. *Karkut v. Target Corp.*, 453 F.Supp.2d 874, 884 (E.D. Pa. 2006).   To that end, the Court must determine whether probable cause existed as a matter of law at the time Milkent allegedly detained Pope.

Ordinarily, "the question of probable cause in a section 1983 damage suit is one for the jury." *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998) (citing *Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir. 1978)).   "However, a district court may conclude 'that probable cause exists as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary finding,' and may enter summary judgment accordingly." *Merkle v. Upper Dublin School Dist.*, 211 F.3d 782, 788-89 (3d Cir. 2000) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997).   In determining the existence of probable cause, a "common sense" approach is taken in considering "the totality of the circumstances" as to whether "the

---

[7]

The 2005 amendment did not alter section (d).

information within the arresting officer's knowledge at the time of the arrest is sufficient to warrant a reasonable law enforcement officer to believe that an offense has been or is being committed by the person to be arrested." *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000) (citing *United States v. Cruz*, 910 F.2d 1072, 1076 (3d Cir. 1990); *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997)). In the context of the Retail Theft Immunity Act, one court has described probable cause in this manner:

> Probable cause means that the person detaining or confining the suspect believes at the time of the detention or confinement, and a reasonable person under the same circumstances would also have believed, that he had sufficient information of the facts to reasonably believe that a theft of merchandise from the store had been committed (or was being committed) and that the person detained or confined was guilty of that theft of merchandise from the store.

*Pinkett*, 1988 WL 30952, at *6.

Russell provides the basis for probable cause in his deposition, in which he testified that:

> A.  With [Pope's] back to me, and the shopping cart in front of her, she had a purse on her left shoulder, along with a long outer garment, which was I believe a flannel shirt, long sleeve, and a T-shirt underneath. And I observed this as I walked by. She reached into the buggy of where the plastic bag was in the buggy, and there was a motion. Her arm came - - an arm came from that buggy. It went underneath and back into the long-sleeve flannel shirt. And there was a movement made down, possibly into the pants it looked like to me. And the arm came back out.
>     At that point, it looked as if a suspicion would be that something come out from that buggy area into there. And I had seen a protrusion at the same time walking down that aisle from the left area of her back, at about the belt area. It was sticking above the belt six to eight inches probably, and it was more of a rectangular shape in that area on the left side of the body.
> . . .

Q. Okay. Now, when she - - when she said she didn't steal, and that essentially that she didn't have anything there, did that satisfy you?

A. No.

Q. Why not?

A. Well, because of the protrusion.

Q. Okay. While you were there, you still could see the protrusion?

A. Yes.

. . .

Q. All right. I just want to see how solid that you're conveying it to me. As we sit here today, you believe there was an item in her - - under her shirt at that time?

A. I have no second thoughts about that. Yes.

(Russell Dep. at 33:9-34:3, 46:16-21, 48:3-7). In Milkent's deposition, Milkent testified what

Russell had told him regarding Pope's behavior and his observations thereof:

A. [Russell] started explaining to me that he was alerted by an employee that there was a female that was walking up and down the aisles, appeared to be suspicious because she had a Shop'n Save bag that was open in the top compartment of the shopping cart.

Q. Okay.

A. Howard said he began to watch the female. He kept on [sic] eye on the female for a while. He observed her place her, I believe it was her left arm behind her back at a certain point, which Howard believed she was trying to conceal some items --

Q. Okay.

A. - - in the back of her, small of her back. Howard said she went through the checkout line, went thought the checkout, and he had approached her at the vestibule and asked to see her receipt.

(Milkent Dep. at 18:4-21). Even though Russell did not actually witness Pope place an item into

her pants, the Court finds that the movement of her arm (behind her back and down) coupled

with the "protrusion" that Russell saw immediately thereafter establishes probable cause to

question and investigate Pope.

As to Milkent, the Court agrees with his testimony that he had no reason to disbelieve the information that Russell provided him with respect to Pope's conduct within the store. *Lynch v. Hunter*, Civ. Act. No. 00-CV-1331, 2000 WL 1286396, *4 (E.D. Pa. Sept. 1, 2000) (citing *Gramenos v. Jewel Cos.*, 797 F.2d 432, 439 (7th Cir.1986)). Furthermore, the Court finds that the information that Russell provided Milkent established probable cause to continue the investigation of Pope:

> A.   [Russell] told me that [Pope] was in one of the aisles. He was watching the bag. Because she had an open bag.
>
> Q.   Okay.
>
> A.   He observed her in one of the aisles. Looked like she took something off the shelf, he wasn't sure what it was, and the next movement was her arm going behind her back
>
> . . .
>
> Q.   Was Howard [Russell] telling you that she had taken an item from the shelf and placed it in her clothing to -- behind her, or not?
>
> A.   Yes, he believed that, yes.
>
> Q.   Okay. He believed he had observed that?
>
> A.   Yes.

(Milkent Dep. at 29:24-30-6, 30:12-17). Milkent later testified that he had the authority to search Pope:

> Q.   For the next investigative step. At that point, knowing that that's the way to resolve the problem, did you believe you have the authority or did not have the authority to touch [Pope] for the purposes of determining whether there was any goods on her?
>
> A.   Oh, I would have had the authority.

(Milkent Dep. at 39:7-13). Furthermore, Milkent confirmed Russell's observations as to a "protrusion":

> Q.   Did you ever tell Ms. Pope that it looks like there's something back there, being in the back, of her pants?

A. Yeah, I did. Uh-huh.
Q. And did she respond to you by, "that's just fat"?
A. Yes.

(Milkent Dep. at 71:12-18).

In considering the "totality of the circumstances" with respect to Russell and Milkent's observations, there would have existed probable cause to believe that Pope was in possession of stolen goods. That Pope spent an abnormal amount of time in the store, that she purchased only a few items, and that Russell observed suspicious movement with her arm behind her back, all of which Russell conveyed to Milkent, and, perhaps most significantly, that Russell and Milkent observed a protrusion under Pope's clothes, taken together, all establish probable cause to suspect that Pope was committing retail theft. It is of no consequence that Milkent chose not to arrest Pope. Simply stated, Milkent was not comfortable escalating the situation with Pope by making an arrest without her cooperation. (Milkent Dep. at 39:17-40:2). Since there was probable cause for Milkent to search Pope, the Retail Theft Act provides the Rostraver Defendants with immunity from the false imprisonment and the assault and battery claims. To that end, Rostraver Defendants' motion for summary judgment is granted with respect to said claims.

**B. SECTION 1983 CLAIMS AGAINST OFFICER MILKENT IN HIS INDIVIDUAL CAPACITY**

Milkent asserts that he is entitled to qualified immunity as to Pope's § 1983 civil rights claims.

The Supreme Court has made it clear that the analysis for qualified immunity is a two part test. First, "[t]aken in light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Scott v. Harris*, --- U.S. ----, 127

S.Ct. 1769, 1774 (2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Second, "[i]f, and only if, the court finds a violation of a constitutional right, 'the next sequential step is to ask whether the right was clearly established ... in light of the specific context of the case.'" *Scott*, 127 S.Ct. at 1774 (quoting *Saucier*, 533 U.S. at 201).  Indeed, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

As to the alleged constitutional violation, Pope alleges that Milkent's conduct constituted assault, battery and false imprisonment, which resulted in an unreasonable seizure in violation of the Fourth and Fourteenth Amendments to the United States Constitution.  (Docket No. 1-2 ¶16).  While Milkent denies having ever touched Pope, because Milkent had probable cause to search Pope, the alleged search could not have been a constitutional violation.  Accordingly, Milkent is entitled to qualified immunity.  Therefore, the Rostraver Defendants' motion for summary judgment with respect to said claims is granted and Pope's cross-motion for summary judgment will be denied.

### C.  Section 1983 Claims against Rostraver Township, Rostraver Township Police Department, and Officer Milkent in His Official Capacity

In her Complaint, Pope alleges that Rostraver Township violated her civil rights through its customs, practices, and procedures, which include a failure to train officers in the requirement to have probable cause to search or seize, a failure to take disciplinary action against offending officers, and that the Township ratified the conduct of Milkent. (Docket No. 1-2 ¶17).[8]  However,

---

[8]

Pope's Complaint contained a fourth allegation that Shop'n Save and Rostraver Township have established joint policies and customs.  On March 9, 2007, this allegation along with the § 1983 claim against Shop'n Save were dismissed.  (*See* Docket No. 23).  What remains are alleged claims against Rostraver Township and Officer Milkent.

in her opposition brief, Pope stipulates that the Rostraver Township Police Department should not be retained in this case. (*See* Docket No. 38 at 9). Accordingly, the Court dismisses with prejudice the Rostraver Township Police Department.

When a plaintiff brings a suit against a state actor in his or her official capacity, that claim is treated as if it were brought against the government of which the state actor is an agent. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Therefore, Pope's claims against Milkent in his official capacity are the same as the claims being brought against Rostraver Township. To that end, the Court shall treat said claims against Rostraver Township and Milkent in his official capacity as one and the same.

In order to sustain a § 1983 claim against a municipal government, the plaintiff must show a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Indeed, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §1983." *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1979).

Rostraver Township argues that Pope has not provided even a scintilla of evidence to support her claims, instead merely relying on the deposition of Sergeant Raymond Dugan (Docket No. 38-3). The Court agrees. Dugan's testimony only provides a basis to conclude that Rostraver does not have a policy of searching or seizing individuals on a less than probable cause basis. (Docket No. 38-3 8:10-16).[9] Pope provides no other factual basis in support of her

---

[9]

In an attempt to show a pattern of behavior, Pope also points out that Milkent has previously been sued for § 1983 violations. However, in that case, the Court also granted summary judgment in Milkent's favor. *See Lynn v. Christner*, No. Civ. 03-0846, 2007 WL 2597878, at *1 (W.D. Pa.

claims against Rostraver Township. As a result, Pope cannot meet her burden of producing any evidence to support her claim against Rostraver Township. Therefore, with respect to the claims against Rostraver Township and Officer Milkent in his official capacity, the Rostraver Defendants' motion for summary judgment will be granted and Pope's cross-motion for summary judgment with respect to said claims will be denied.

### D. CLAIMS OF ASSAULT AND BATTERY AGAINST MILKENT IN HIS INDIVIDUAL CAPACITY

Pope alleges that when Milkent poked her; said poking constituted an assault and battery under Pennsylvania common law. Assault is defined as the "intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small degree, upon the person." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) (citing *Cohen v. Lit Brothers*, 70 A.2d 419, 421 (Pa.Super. 1950)). Assault, however, is more than just a mere attempted battery. An assault is "an act intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery." *Cucinotti v. Ortmann*, 159 A.2d 216, 217 (Pa. 1960). It is the freedom from the fear of offensive or injurious bodily contact that the tort of assault seeks to protect.

A battery occurs when there is some contact with the body of a person. A claim for battery does not require any physical injury to be suffered, only that some contact occurred. *Montgomery v. Bazaz-Sehgal*, 742 A.2d 1125, 1130 (Pa.Super. 1999) (citing *Chandler v. Cook*, 265 A.2d 794 (Pa. 1970)). However, it is recognized that "[a] police officer may use reasonable

---

Sept. 4, 2007).

force to prevent interference with the exercise of his authority or the performance of his duty." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994).

To the extent (if at all) that the Retail Theft Act does not provide immunity to the claims of assault and battery against Officer Milkent in his individual capacity,[10] the existence of probable cause lends privilege to him, as well. Because Milkent had probable cause to search and seize Pope and the alleged poking would have been a reasonable means of determining whether she had committed retail theft, Pope's claim for assault and battery must fail.

Accordingly, as to the claims of assault and battery against Officer Milkent, in his individual capacity, the Rostraver Defendants' motion for summary judgment will be granted and Pope's cross-motion for summary judgment will be denied.

### E. CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST OFFICER MILKENT IN HIS INDIVIDUAL CAPACITY

Pope alleges a separate claim for intentional infliction of emotional distress with respect to the acts that Milkent allegedly undertook. Pope originally brought a claim for intentional infliction of emotional distress against Shop'n Save as well, but that claim was dismissed on March 7, 2007. (*See* Docket No. 23). While it is disputed by the Rostraver Defendants whether such a claim even exists under Pennsylvania law, both the Superior Court of Pennsylvania as well as the U.S. Court of Appeals for the Third Circuit have held that Pennsylvania law recognizes the tort despite the lack of precedent from the Supreme Court of Pennsylvania. *See Silver v. Mendel*, 894 F.2d 598 (3d Cir. 1990); *Hunger v. Grand Cent. Sanitation,* 670 A.2d 173

---

[10]

The Act authorizes the following purposes "to require the suspect to identify himself, to verify such identification, to determine whether such suspect has in his possession unpurchased merchandise taken from the mercantile establishment and, if so, to recover such merchandise, to inform a peace officer, or to institute criminal proceedings against the suspect." 18 Pa. C.S.A. §3929(d); *see Angelopoulos v. Lazarus PA Inc.*, 884 A.2d 255, 260 (Pa. Super. 2005).

(Pa. Super 1996). Furthermore, considering the Shop'n Save Defendants' motion to dismiss, Judge Hardiman found that that there exists a cause of action in Pennsylvania for intentional infliction of emotional distress, which represents the law-of-the-case. (*See* Docket No. 23 at 6).

The elements for intentional infliction of emotional distress are that "(1) the conduct must be extreme and outrageous; (2) the conduct must be intended; (3) the conduct must cause emotional distress; and (4) the distress must be severe." *Silver*, 894 F.2d 606 n.16. On the facts alleged, Milkent's conduct does not rise to the level of extreme and outrageous.

Extreme and outrageous has been explained as being:

> where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Hunger*, 670 A.2d at 177. In the Court's estimation, Milkent's alleged conduct cannot reasonably rise to the level of outrageousness. In particular, as explained *supra*, the alleged poking would have been justified by the existence of probable cause thus making said conduct fall far short of being considered "atrocious and utterly intolerable." *Id*. As a result, Pope's separate claim for intentional infliction of emotional distress fails.

Accordingly, with respect to said claim against Officer Milkent in his individual capacity, the Rostraver Defendants' motion for summary judgment will be granted and Pope's cross-motion for summary judgment will be denied.

## CONCLUSION

For the reasons stated above, the Shop'n Save Defendants' Motion for Summary Judgment [DE 30] is GRANTED and the Rostraver Defendants' Motion for Summary Judgment [DE 34] is

GRANTED.  As to Pope's Cross-Motion for Summary Judgment [DE 41], it is DENIED.  An appropriate Order to follow.

_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

cc/ecf:  All counsel of record.

Date:    April 16, 2008.